Ahmed **ABDELSAMED**, a/k/a John Adams, Plaintiff–Appellee,

v.

**NEW YORK LIFE INSURANCE COMPANY, Defendant–Appellant.**

No. 91CA0705.

Colorado Court of Appeals, Div. I.

Aug. 27, 1992.

Rehearing Denied Dec. 10, 1992.

Certiorari Granted (Abdelsamed) Aug. 23, 1993.

Cross–Petition for Certiorari Denied Aug. 23, 1993.

---

Andrew T. Brake, P.C., Andrew T. Brake, Lee T. Judd, Denver, for plaintiff-appellee.

Grant McHendrie, P.C., Donald B. Gentry, Denver, for defendant-appellant.

Opinion by Chief Judge STERNBERG.

Defendant, New York Life Insurance Company (NYL), appeals a judgment entered on a jury verdict in favor of plaintiff, Ahmed Abdelsamed, on his claims of breach of an insurance contract and bad faith and against NYL on its counterclaim

for rescission. We reverse and remand for a new trial.

In December 1985, the plaintiff, a resident of New Jersey and a self-employed engineer and consultant, applied to NYL for disability insurance coverage. In his application, he stated that his gross annual income for 1985 was $392,000 and that he had no other disability insurance. However, in the preceding four months, he had applied for disability insurance from three other companies, and at the time of his application to NYL, he was insured by two of them under policies which would provide him with monthly disability benefits totalling $10,000. Although NYL later became aware of these policies, there is conflicting evidence as to whether the plaintiff disclosed this information to NYL before the coverage began or whether NYL acquired knowledge of the policies after the plaintiff initiated his lawsuit.

NYL's coverage, which began on March 27, 1986, provided for monthly benefits of $3,080 beginning on the 31st day after a total disability occurred. The policy also provided, in somewhat ambiguous language, for a two-year contestability period during which NYL could investigate and rescind the policy if it determined that there were material misrepresentations on the application.

Only a few days after coverage became effective, while the plaintiff was traveling on business in Egypt, he was admitted to a psychiatric hospital in Cairo. He was not discharged until August 31, 1986. He was hospitalized in a second Egyptian hospital from late September until January 30, 1987, at which time he began his return journey to the United States. However, he was admitted to a psychiatric hospital in Germany after apparently suffering another psychotic episode during which he lost all his travel documents and personal papers. After the plaintiff's condition stabilized in March 1987, State Department personnel helped him to arrange travel to his requested destination of Colorado Springs.

Within days of his arrival in Colorado Springs, the plaintiff was committed to Colorado State Hospital, and following his release, seventeen days later, he lived in a community shelter house. He was subsequently deemed eligible for Social Security disability benefits based upon his psychiatric disability and has continued ever since to receive psychiatric care.

The plaintiff filed a claim of total disability with NYL in April 1986. NYL undertook a contestability investigation, which included hiring investigators in Egypt to verify the plaintiff's hospitalization. NYL also asked the plaintiff for daily hospital records from Egypt and authorization to obtain records from the IRS and the Small Business Administration to verify his earnings.

The plaintiff responded by providing one-page hospital discharge summaries and what he represented to be copies of his 1984 and 1985 tax returns. NYL contended this documentation was insufficient, and in August 1987, it notified the plaintiff that his file was closed pending receipt of the requested information. The plaintiff provided no further information, and NYL neither approved nor denied the claim.

In November 1987, 19 months after filing his claim, the plaintiff sued NYL for breach of contract, bad faith, and outrageous conduct, seeking both actual and exemplary damages. NYL defended on the basis that the plaintiff was malingering (feigning mental illness) and that it was acting reasonably when it requested additional information from the defendant.

NYL also counterclaimed for rescission on the grounds that because the plaintiff had failed to provide proof other than his own assertions regarding his income, it had concluded that he had misrepresented this income. It argues that this, together with his failure to disclose other disability insurance coverage on his application, constituted material misrepresentations.

A jury returned a verdict of $209,644.07 on the plaintiff's claim for breach of contract and $915,933.21 for bad faith; it found against NYL on its counterclaim for rescission. Thereafter, the court denied NYL's motions for judgment notwithstanding the verdict and a new trial.

NYL's principal argument is that it was denied a fair trial by the court's decisions concerning the admissibility of evidence relevant to NYL's theory that the plaintiff had a plan to defraud the company. We agree that evidentiary rulings of the trial court do constitute error, and that these errors require reversal.

## I.

### Evidentiary Issues

### A.

### "Other Acts" Evidence

In a previous application for disability insurance with another company, the plaintiff stated that he planned to travel outside the United States frequently. A similar statement in an application with a second company resulted in denial of coverage. Thereafter, on an application with a third company, the defendant responded "No" to the inquiry concerning foreign travel. Additionally, in the months prior to his application with NYL, the plaintiff filed a theft loss claim for some computer equipment and cash with another insurance company. NYL contended this claim was fraudulent.

When asked his opinion as to whether the plaintiff was feigning mental illness, the plaintiff's medical expert testified: "If you told me he had been arrested a number of times or he had had bogus claims for one thing or another, I would say that might put him more in this direction." NYL was not permitted to cross-examine him on whether his opinion would be changed by the knowledge of the plaintiff's misrepresentations on other applications or his alleged false loss claim.

NYL argues that evidence of these acts should have been admitted under CRE 404(b) to show the plaintiff's plan to defraud, his intent, and absence of mistake. It further argues that, because this evidence was excluded, NYL was unable effectively to cross-examine the plaintiff's medical expert. We agree.

Although CRE 404(b) is most frequently applied in criminal prosecutions, it also applies in civil cases if the proffered evidence is relevant to the issues. *College v. Scanlan*, 695 P.2d 314 (Colo.App.1985).

Under the four-part analysis required to determine whether evidence of other acts is admissible to prove plan, intent, or absence of mistake, a court must ask 1) whether the evidence is relevant to a material fact; 2) whether it is logically relevant; 3) whether the logical relevance is independent of the intermediate inference that the defendant has a bad character; and 4) whether its probative value is substantially outweighed by the danger of unfair prejudice. *People v. Spoto*, 795 P.2d 1314 (Colo.1990).

A trial court has broad discretion to determine both the relevancy of evidence and its relative probative value and prejudicial effect. *People v. Hulsing*, 825 P.2d 1027 (Colo.1991). Here, however, the court's only stated basis for refusing to admit the "other acts" evidence was that it did not find these matters were "an issue" in the trial. Based upon our review of the record, we conclude this was error.

The jury did receive evidence that the plaintiff had not initially disclosed to NYL that he had other disability insurance. The additional fact that the plaintiff had made misrepresentations on other disability applications could lend support to the defendant's theory that the plaintiff had a plan to defraud his insurers. Evidence that he filed an allegedly false loss claim with another company is relevant to this theory as well.

Nor can we conclude that the probative value of this evidence was outweighed by its prejudicial effect. Although the plaintiff argued that introduction of these matters would cause confusion for the jury, the issue of the plaintiff's malingering was central to the defendant's case, and proof of a plan to defraud was an important element in establishing a motive for feigning mental illness.

Therefore, we hold that the "other acts" evidence should have been admitted and that, on retrial, NYL should be permitted to cross-examine the plaintiff's medical expert on this issue.

## B.

### Expert Opinion Evidence by Non–Expert

■ We also agree with NYL's contention that the testimony of an employee of the Division of Insurance was improperly admitted.

The plaintiff had filed a complaint with the Division under § 10–3–1104, C.R.S. (1987 Repl.Vol. 4A), which regulates competition and business practices in the insurance industry, and he had called the employee to testify as to the Division's opinions about "the nature of the misconduct ... in this case." Over NYL's objection, the court ruled that:

the witness will be allowed to testify ... as to her employment, her training and experience, her knowledge of standards that may be set by the state and her knowledge of matters that she's determined through her investigation are facts in this case, but that testimony should not go to the point of her expressing opinions as to whether or not a claim has been handled in good faith, nor should it go to the point of expressing official positions of the Division of Insurance as to whether or not there has been some preliminary or final determination of violation of statute or rule.

Despite this ruling, and over objection, the witness was permitted to testify that, based upon her review of the plaintiff's income tax information, he had not misrepresented his income and, based upon her review of the medical reports, the plaintiff was not malingering and that she therefore believed that NYL had violated that statute by not paying or denying the claim promptly.

The court's order limiting the employee's testimony properly recognized that a witness must be qualified before giving expert opinion testimony. *Denver Urban Renewal Authority v. Berglund–Cherne Co.*, 193 Colo. 562, 568 P.2d 478 (1977). Furthermore, in response to NYL's objections, the court reminded the jury that the witness was not an expert.

However, her testimony expressly violated the limitations imposed by the court and, because the witness was not properly qualified as an expert, the court erred in permitting her to give opinion testimony concerning the plaintiff's income or medical condition. Nor was that error rectified by the court's cautions to the jury.

## C.

### Hearsay Evidence

NYL also argues that certain documents relating to the plaintiff's income were inadmissible hearsay. We agree and conclude that their admission constitutes an independent basis for reversal.

Written statements, signed by Abdel Majid Salama, an Egyptian businessman, stating that his company had paid the plaintiff $650,675 in consulting fees in 1985, were presented during a deposition in New York in September 1988, in which counsel for both parties participated. However, that businessman was not present at trial, and no portion of his deposition was read into evidence. Nevertheless, finding that the documents were self-authenticating because they bore a notary-type acknowledgment, the court ruled that the documents were admissible under CRE 803(24), the residual exception to the hearsay rule. NYL contends that this finding is insufficient to establish the trustworthiness of the documents. We agree.

■ CRE 803(24) permits a hearsay statement which has circumstantial guarantees of trustworthiness equivalent to other hearsay exceptions to be admitted if the court determines that it is offered as evidence of a material fact and if it is more probative on the point for which it is offered than any other evidence which its proponent could reasonably produce.

Among the factors used to determine trustworthiness are: 1) the nature and character of the statement; 2) the relationship of the parties; 3) the motivation of the declarant; 4) the circumstances under which the statement was made; 5) the knowledge and qualifications of the declarant; 6) the existence or lack of corroboration; and 7) the availability of the declarant

at trial for cross-examination. *See Herdman v. Smith,* 707 F.2d 839 (5th Cir.1983); *United States v. West,* 574 F.2d 1131 (4th Cir.1978).

 The documents produced by the businessman were a "Year End Statement," dated September 18, 1988, and his accompanying affidavit, of the same date, asserting that his company had paid the plaintiff gross consultation fees of $650,675 in 1985. These statements were simply summaries, made three years after-the-fact and nine months after litigation began. There is nothing in the documents themselves to indicate that the affiant was an authentic representative of an authentic company, and although the plaintiff had the opportunity to develop such evidence when he deposed the businessman, he elected not to enter the deposition into evidence. Furthermore, no other witness at trial independently authenticated the businessman or his company, nor was any witness available to explain the content of the exhibits. In fact, the only other evidence to substantiate the plaintiff's assertions as to his income were his copies of his tax returns which bore irregular date stamps. No official tax records were available as the plaintiff earlier had withdrawn his authorization permitting NYL to acquire his IRS records.

We conclude that, because of the non-specific nature of the documents, the lack of corroborating evidence, the fact that they were executed several years after the payments were allegedly made, and the lack of testimony explaining their content or authenticating the declarant, they failed to meet the test of circumstantial guarantees of trustworthiness required by CRE 803(24), and they should not have been admitted.

#### D.

*Improper Cross–Examination*

NYL's next contention of error relating to the admission of evidence concerns the trial court's decision to permit cross-examination of NYL's medical expert concerning a case in which the expert had been a party (the *Anderson* case).

As part of the settlement agreement in the *Anderson* case, the court had issued protective orders to keep all discovery confidential and to seal the court files. Just before NYL called the expert to testify, the trial court granted the expert's attorney's motion for a protective order against revealing discovery and to quash the plaintiff's subpoena duces tecum seeking production of documents relating to the *Anderson* case.

However, the court ruled that the expert could be cross-examined as to whether he had been sued in the *Anderson* case, whether that suit had been settled, and the nature of the claims against him. Additionally, it stated that the expert could respond to *any* questions about the case by saying he was not permitted to answer questions which would require him to violate the *Anderson* court's protective orders.

NYL objected, and now argues that these rulings resulted in the jury's being left with an impression that the expert was hiding significant facts and that NYL was unable to rehabilitate him because of the *Anderson* court's confidentiality orders. We agree.

 The limits of cross-examination of a witness concerning his credibility is within the sound discretion of the trial court. *People v. Evans,* 630 P.2d 94 (Colo.1981). However, a trial court is under a duty to protect witnesses from questions which go beyond the bounds of proper examination for the purposes of harassment, humiliation, or annoyance. *United States v. Smaldone,* 484 F.2d 311 (10th Cir.1973).

 Here, the plaintiff was attempting to impeach NYL's expert by showing that his testing methods were unreliable and had been challenged in the *Anderson* case. However, both the plaintiff and the court knew that cross-examination could not elicit this information because the expert was under a court order not to reveal information concerning that case. Permitting the expert to be cross-examined on matters regarding which he was legally required to

remain silent was tantamount to permitting the witness to be harassed, and it resulted in unfair prejudice to NYL. *See Locke v. Vanderark*, 843 P.2d 27 (Colo.App.1992). Cross-examination concerning the *Anderson* case should not be permitted on retrial.

### E.

#### *Insurance Expert's Testimony*

Finally, NYL contends that it was prejudiced by the court's decision to permit the plaintiff's insurance expert to testify. We perceive no error in the court's ruling.

The expert opined that because the plaintiff had submitted a written proof of loss and because NYL had not sent him different forms within 15 days, the burden of proof shifted to NYL to establish grounds to avoid the claim. NYL argues that, when read together, the policy provision concerning claim forms and the provision on notice of claims unambiguously relieve NYL of any obligation to seek further information from the plaintiff. In NYL's view, the universal claim form submitted by the plaintiff encompassed sufficient details concerning his disability to negate any need for additional forms.

■ The determination of the existence of an ambiguity in an insurance policy is a question of law, and the court must examine the policy as a whole in making the determination. *Farmers Insurance Co. v. Plunkett*, 687 P.2d 470 (Colo.App.1984). However, this court is not bound by the trial court's determination. *Barnes v. Van Schaak Mortgage* 787 P.2d 207 (Colo.App. 1990).

■ Nevertheless, our independent review of the language of the policy leads us to conclude, as did the trial court, that the contractual provisions concerning the submission of a written proof of loss are ambiguous, and accordingly, we hold that the court did not err in permitting expert testimony to explain the terms of the policy. *See Union Rural Electric Ass'n v. Public Utilities Commission*, 661 P.2d 247 (Colo. 1983) (when a contract is determined by the court to be ambiguous, the meaning of its terms is a question of fact to be determined in the same manner as other disputed factual material).

### II.

#### *Jury Instructions*
#### A.

#### *Choice of Law*

Among the other issues that may arise on retrial is NYL's contention that the court should have instructed the jury on New York, rather than Colorado law, concerning the tort claim of bad faith breach of an insurance contract. It contends that, under a "most significant relationship" analysis, the place where the conduct causing the injury occurred should be given primary import and that because the decision not to pay benefits was made in New York, that state's law should apply. It also contends that because the occurrence of harm to the plaintiff in Colorado was unforeseeable, the place where the injury occurred should not be controlling. Finally, NYL reasons that tort damages under a bad faith claim are similar to exemplary damages and that New York, rather than Colorado, has the greater interest in punishing the misconduct of its businesses. We reject these contentions.

■ In multistate tort controversies, Colorado applies the analysis of the *Restatement (Second) Conflict of Laws* § 145, (1969), which provides that the court must determine which state has the most significant relationship to the occurrence and the parties. *First National Bank v. Rostek*, 182 Colo. 437, 514 P.2d 314 (1973).

This analysis requires an evaluation of the relative importance of several factors: 1) where the injury occurred; 2) where the conduct causing the injury occurred; 3) the domicile, residence, place of incorporation, and place of business of the parties; and 4) the place where the relationship between the parties is centered.

■ Additionally, the general principles stated in *Restatement (Second) Conflict of Laws* § 6 (1969) must be taken into ac-

count. These include: 1) the relevant policies of the forum and the interested state; 2) the relative interests of the states in the determination of the issue; 3) the protection of justified expectations; and 4) the certainty, predictability and uniformity of result.

The factors listed in *Restatement* § 6 vary in importance and "the protection of the justified expectations of the parties, which is of extreme importance in such fields as contracts, property, wills and trusts, is of lesser importance in the field of torts." *Restatement (Second) Conflict of Laws* § 145, comment b (1969). Of greater importance in tort cases is the "purpose sought to be achieved by the relevant tort rules of the interested states," *Restatement (Second) Conflict of Laws* § 145, comment c (1969).

In determining which state has the most significant relationship under the facts before us, we conclude that the relative interests of the states in the determination of the outcome is the most significant guiding principle.

In our view, Colorado has a significant interest in enforcing its requirements that insurance companies, licensed and doing business in this state, act in good faith and deal fairly with its residents. We agree with the district court that the state can do so best by uniformly applying its own laws to those who tortiously violate their contractual obligations.

Accordingly, we hold that the court properly instructed the jury regarding liability and damages elements relating to bad faith breach of insurance contracts under Colorado law.

### B.

### *Rescission Instruction*

NYL next argues that although the court agreed to apply New York law to contract issues, it nevertheless erroneously followed Colorado law when it instructed the jury on the elements of rescission. We agree with this contention.

The instruction required the jury to find proof by a preponderance of the evidence that: 1) the applicant made a false statement of fact or concealed a fact in his application; 2) either knowingly or innocently; 3) which materially affected either the acceptance of the risk or the hazard assumed by the insurer; and 4) the insurer was ignorant of the false statement or concealed fact.

Citing *Kantor v. Nationwide Life Ins. Co.*, 16 A.D.2d 701, 227 N.Y.S.2d 703 (S.Ct. App.Div.1962), NYL argues that, under New York law, it was required to prove only false representation, materiality, and that the insurer would not have issued the policy if it had knowledge of the true facts. It further contends that a misrepresentation is material if knowledge by the insurer of the true facts would have led to a refusal to make the contract and that there need be no connection between the fact misrepresented and the risk being insured. In support it cites *Massachusetts Mutual Life Insurance Co. v. Tate*, 42 N.Y.2d 1046, 399 N.Y.S.2d 211, 369 N.E.2d 767 (S.Ct.App. Div.1977), *rev'd on dissent below*, 56 A.D.2d 173, 391 N.Y.S.2d 667. In its view, the third element in the court's instructions creates an inference that the fact misrepresented must be related in some way to the risk being insured, thereby creating an increased burden of proof upon NYL.

The record reveals that the court's instruction was intended to incorporate concepts of New York law which differ from Colorado into a Colorado format. However, NYL correctly observes that the court's instruction contains language from § 10–8–111(3), C.R.S. (1987 Repl.Vol. 4A), and mirrors the elements listed in *Hollinger v. Mutual Benefit Life Insurance Co.*, 192 Colo. 377, 560 P.2d 824 (Colo.1977). We agree that it could have created the inference suggested by NYL. Accordingly, the judgment against NYL on its counterclaim cannot stand, and on retrial, the trial court should give instructions on the elements of rescission which more clearly reflect New York law.

## C.

### Bad Faith and Rescission

Finally, NYL argues that both the actual language in the rescission instruction as well as the sequence of deliberation required by the verdict forms erroneously permitted the jury to find breach of contract, even if it also found NYL had proved rescission. It contends that the court should have instructed the jurors that if they found NYL properly rescinded the contract, the contract was void from its inception and that, consequently, there could be no claim for bad faith breach. We agree that such instruction was needed.

The plaintiff urges us to adopt a rule which would impose a duty of good faith until such time as the insurer's claim for rescission is adjudicated. We decline to do so.

■ The duty of the insurer to act in good faith when dealing with its insured is implied by law as a covenant of the contract. Further, the basis for liability in tort for the breach of an insurer's implied duty of good faith and fair dealing is grounded upon the special nature of the insurance contract and the relationship which exists between the insurer and the insured. *Farmer's Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo.1984).

■ However, the duty of good faith and fair dealing applies to both parties to the insurance contract, and its essence is that neither party should act to impair the right of the other to receive the benefits of the contract. The covenant neither entitles the insured to payment of claims excluded by the policy nor to anything inconsistent with the limitations contained in the contract. *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986).

■ Here, the contract of insurance provided that, if a claim arose within two years, the company could investigate statements on the insured's application. Under the applicable law, a material misrepresentation on the application is grounds for rescission of the contract. *Kantor v. Nationwide Life Insurance Co., supra.* Furthermore, rescission voids an insurance contract *ab initio. Eggen v. M & K Trail-ers & Mobile Home Brokers, Inc.*, 29 Colo. App. 177, 482 P.2d 435 (1971).

To impose a duty of good faith upon the insurer in the face of an insured's material misrepresentation would be to recognize only one side of the contractual relationship. In effect, it would deprive the insurer of its reasonable expectation of enforcing its contractual rights under the contestability clause. If NYL were to be liable during the period between its initiation of the contestability investigation and the adjudication of its right to rescind, then it would be denied its rescission right of placing the parties in the position they were in prior to contracting.

Thus, we conclude that this, too, was reversible error and that, on retrial, the instructions should clearly state that if the jury finds grounds for rescission, it may not find bad faith breach of the insurance contract.

In view of our disposition of the case, we find it unnecessary to address the remaining issues raised by NYL.

The judgment is reversed, and the cause is remanded for retrial of plaintiff's claims and defendant's counterclaim.

NEY and DAVIDSON, JJ., concur.